AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

1997 White GMC passenger van,
VIN# 1GTHG39F6V1096211,
MD license plate# 33298B

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER:

(Further described below)

I ___Troy Yeager_____ being duly sworn depose and say:

I am a(n)___Special Agent with the HHS IG_____ and have reason to believe
                          (Official Title)

that  (name, description and or location)

1997 White GMC passanger van, VIN# 1GTHG39F6V1096211, MD license plate# 33298B

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property
to be searched)

See attachment A

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)
       evidence of a crime

concerning a violation of Title health care fraud  United States Code, Section(s) 1347, 1035(a)(2)  . The facts
to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED
HEREIN

Continued on the attached sheet and made a part hereof.      YES  ☐  NO

_____
Troy Yeager
Signature of Affiant

Sworn to before me, and subscribed in my presence

_____     at Washington, D.C.
Date

_____     _____
Name and Title of Judicial Officer        Signature of Judicial Officer

**AFFIANT**

Your Affiant, Special Agent E Troy Yeager has been a Special Agent with the United States Department of Health and Human Services – Office of Inspector General (DHHS-OIG) since November 2001. Special Agent Yeager obtained a Bachelors degree in criminal justice at Northeastern University. Special Agent Yeager successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC), and the Inspector General Investigator Training Program at the FLETC. Special Agent Yeager has been involved in numerous investigations pertaining to health care fraud and the diversion of pharmaceutical drugs. Special Agent Yeager has also been the Affiant and/or participant on numerous search and seizure warrants. Special Agent Yeager has also been involved in the debriefing of informants and has made or participated in arrests in health care fraud investigations.

## INTRODUCTION

The information contained in this affidavit is based on your Affiant's personal knowledge and on information provided to him by Special Agents of the Federal Bureau of Investigation (FBI) and other government personnel of the Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigations and Compliance.

Your Affiant alleges that the facts and circumstances contained in this affidavit set forth probable cause to believe that there is kept and concealed within the below listed transportation vehicles are fruits, instrumentalities and evidence of violations of Title 18 United States Code Section 1347 (1): to defraud any health benefit program and Title 18

1

United States Code Section 1035 (a)(2): false statements related to health care matters.

- 1995 White Dodge van, VIN# 2B7KB31Z0SK512358, MD license plate# 616M965

- 1997 White GMC van, VIN# 1GTHG39F5V1095812, MD license plate# 33009B

- 1997 White GMC van, VIN# 1GTHG39F6V1096211, MD license plate# 33298B

## MEDICAID PROGRAM

Medicaid is a program that provides medical assistance for certain individuals and families with low incomes and resources.  The Medicaid program became law in 1965 as a jointly funded cooperative venture between the Federal and State governments to assist States in the provision of adequate medical care to eligible needy persons.   The United States Department of Health and Human Services, Centers for Medicare and Medicaid Services (hereafter, "CMS") is the Federal component responsible for oversight of the Medicaid programs throughout the United States.

Medicaid operates as a vendor payment program, with payments made directly to the providers.   Providers participating in Medicaid must accept the Medicaid reimbursement level as payment in full.  Each State has relatively broad discretion in determining (within federally-imposed upper limits and specific restrictions) the reimbursement methodology and resulting rate for services.  States may impose nominal deductibles, co-insurance, or co-payments on some Medicaid recipients for certain services.

Title XIX of the Social Security Act, which established Medicaid, allows considerable flexibility within the States' Medicaid plans.  However, some Federal requirements are mandatory if Federal matching funds are to be received. A State's

Medicaid program must offer medical assistance for certain basic services to most categorically needy populations.  States may also receive Federal-matching funds to provide certain optional services.

Under the District of Columbia's Medicaid Program, transportation is provided, if requested and the need is established, to all eligible Medicaid recipients who are seeking medical care and services covered under the program.  Federal laws, regulations and rules prohibit falsely claiming transportation expenses not requested and authorized by the District of Columbia's Medicaid Program, or not actually incurred or medically necessary.

CMS contracts with insurance carriers such as Affiliated Computer Services (ACS), and it predecessor, First Health, to process claims and reimburse transportation providers for reasonable claims relating to pre-authorized transportation of Medicaid recipients.

## TRANSPORTATION REIMBURSEMENT FEE SCALE

The Government of the District of Columbia, Department of Human Services distributed Medical Assistance Program, Program Transmittal #97-26 to D.C. Medicaid Transportation Providers.  Program Transmittal #97-26 states in part:  "Effective May 2, 1997, the correct reimbursement rate for the transportation of a single, ambulatory, individual is as follows:

| CODE: | SERVICE DESCRIPTION: | PAYMENT: |
|---|---|---|
| A0120 | Ambulatory van, one way inside the Capital Beltway | $15.00 |
| A0121 | Ambulatory van, round trip inside Capital Beltway | $25.00 |
| A0122 | Ambulatory van, one way inside Capital Beltway with extra assistant | $20.00 |
| A0123 | Ambulatory van, round trip inside Capital Beltway with extra assistant | $30.00 |

| A0124 | Ambulatory van, one way outside Capital Beltway | $25.00 + .75 per loaded mile |
| A0125 | Ambulatory van, round trip outside Capital Beltway | $40.00 + .75 per loaded mile |
| A0126 | Ambulatory van, one way outside Capital Beltway | $30.00 + .75 per loaded mile |
| A0127 | Ambulatory van, round trip outside Capital Beltway with extra assistant | $45.00 + .75 per loaded mile |
| A0128 | Cancellation trip, if the provider goes to the destination and the trip is cancelled upon arrival | $7.50 |

Medicaid Transportation providers must comply with established procedures for transportation services and billing."

The Government of the District of Columbia, Department of Human Services distributed Medical Assistance Program, Program Transmittal #97-14 to D.C. Medicaid Transportation Providers.  Program Transmittal #97-14 states in part:  "These codes are to be used <u>ONLY</u> for customers confined to a wheelchair.  Effective April 1, 1997, the reimbursement rate for the transportation of a single (1) individual will be as follows:

| CODE: | SERVICE DESCRIPTION: | PAYMENT: |
|-------|---------------------|----------|
| A0130 | Wheelchair van, one way inside Capital Beltway | $22.50 |
| A-0130-Z1 | Wheelchair van, round trip inside Capital Beltway | $32.50 |
| A0130-Z3 | Wheelchair van, one way inside Capital Beltway with extra assistant | $27.50 |
| A0130-Z5 | Wheelchair van, round trip inside Capital Beltway with extra assistant | $37.50 |
| A0130-Z0 | Wheelchair van, one way outside Capital Beltway | $30.00 + .75 per loaded mile |
| A0130-Z2 | Wheelchair van, round trip outside Capital Beltway | $45.00 + .75 per loaded mile |
| A0130-Z4 | Wheelchair van, one way outside Capital Beltway with extra assistant | $35.00 + .75 per loaded mile |
| A0130-Z6 | Wheelchair van, round trip outside Capital Beltway with extra assistant | $50.00 + .75 per loaded mile |
| A0130-Z7 | Cancellation, trip if the provider goes to the destination and the trip is cancelled upon arrival | $7.50 |

Medicaid Transportation providers must comply with established procedures for

transportation services and billing requirements.[1]"

On October 1, 2003 the above listed local codes for Medicaid Transportation providers changed to standard codes because the Medical Assistance Administration (MAA) was required to comply with the Health Insurance Portability and Accountability Act's mandated transaction standards, code sets and identifiers by October 16, 2003.

The Government of the District of Columbia, Department of Health distributed Medical Assistance Program, Program Transmittal #03-38 to all District of Columbia Transportation Providers.  Program Transmittal #03-38 states in part:  "Please note that, effective September 30, 2003 MAA will discontinue the use of current local codes for the Transportation providers.  Medicaid claims submitted by the District of Columbia Transportation providers for services rendered on or after October 1, 2003 should be submitted using only the standard codes."

Attached to Program Transmittal #03-38 was "Local Code Crosswalk Addendum – Transportation Providers", to assist Medicaid Transportation providers with the transition to standard codes.

## COMMON FRAUD SCHEMES

Based on your affiants training, knowledge and experience in the investigation of health care fraud, he has identified two common fraud schemes used by Medicaid Transportation providers to defraud the District of Columbia Medicaid program.

**Up-Coding:**

Up-Coding is a term used for describing when a Medicaid provider submits a

---

[1] On or about July 11, 2003, the Medical Assistance Administration began paying an increased

code for reimbursement that is a higher level code than that code for the service actually performed.  Providers up-code in order to obtain a larger reimbursement from the Medicaid program than they would if they had submitted the correct code for the service they provided.  For example: A Medicaid Non-Emergency Transportation (NET) provider with a driver and an extra assistant transports an ambulatory patient round trip inside the Capital Beltway to their day treatment program on October 2, 2003.  The correct code to submit is A-0434-U2 (Ambulatory van, round trip inside Capital Beltway with extra assistant).  This code has a reimbursement rate of $33.00.  Yet, the NET provider submits a code with a higher reimbursement rate such as T2004-U6-U2 (Wheelchair van, round trip inside Capital Beltway with extra assistant).  This code has a reimbursement rate of  $41.25.  In this example the NET provider had defrauded the Medicaid program of  $8.25 for one individual on one day.  Typically, a NET provider transports multiple clients in one day.

**Billing for Services not Rendered:**

Billing for services not rendered is a term used when a Medicaid provider submits a code for reimbursement for a service that they never provided.  Providers bill for services not rendered in order to obtain reimbursement from the Medicaid program for a service that they never provided.  For example:  A NET provider submits code T2004-U6-U2 (Wheelchair van, round trip inside Capital Beltway with extra assistance).  This code has a reimbursement rate of  $41.25.  Yet the service was never provided.    In this example the NET provider had defrauded the Medicaid program of $41.25.

---

reimbursement rate for wheelchair and ambulatory codes, but the codes remained the same until October 1, 2003.

## INITIATION OF INVESTIGATION

The DHHS-OIG and the Federal Bureau of investigation (FBI) have been conducting an investigation of Mash Transportation Inc. (MASH) since November 17, 2003. DHHS-OIG and the Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigations and Compliance identified the DC Medicaid non-emergency transportation program as a program that contained numerous indicators of presumptively fraudulent claims. Based on the above, The Office of Investigations and Compliance and DHHS-OIG initiated investigations on non-emergency transportation providers whose paid claims far exceeded the average company.

### MASH TRANSPORTATION

Key employees of MASH, who all reside at 801 Malibu Drive, Silver Spring, Maryland 20901 have been identified as:

| TITLE: | NAME: | DOB: | SSN: | AKA NAME: |
|--------|-------|------|------|-----------|
| Owner / President | Hind Seidahmed Abdelmati | ██████ | ████████ | Hind S Abdelmati Hind Abdelmati |
| President | Mohamed A. Abdelmomin | ██████ | ████████ | Mohamed Alahmadi, Mohammed Abdelmomin, Mohamedahmed Mohamedahmed |
| General Manager | Esamaldin Awad Elobaid | ██████ | ████████ | Alobaid, Esmaldin Elobaid, Esam Elobaid |
| Biller | Mohamed Ibrahim Nazar | ██████ | ████████ | Mohamedkheir Nazar, I N Mohamed K Nazar, Amed Nazar |

MASH became a District of Columbia Medicaid provider in 2001. According to MASH's Government of the District of Columbia - Department of Health Medical Assistance Administration Provider Application Hind Abdelmati is the president of MASH and Esam Elobaid is the General Manager and is designated as the responsible party for complying with the conditions of participation in the DC Medicaid program.

7

Mohamed Abdelmomin was formerly the owner of Sinnar Care Inc. a DC Medicaid non-emergency transportation provider located at 10620 Georgia Avenue, Suite #100 Silver Spring, MD 20902 with Medicaid provider number 1000900.  In 2001 Sinnar Care Inc. changed it's name to MASH, keeping the same provider number (1000900), but changing it's business address to 6475 New Hampshire Avenue, Suite 350I Hyattsville, MD 20783 and it's president to Hind Abdelmati.  According to surveillance and an interview with New Hampshire Business Center employee, MASH is no longer renting office space at New Hampshire Avenue and the key employees are typically at their residence 801 Malibu Drive Silver Spring, MD 20901 during business hours.

According to MASH's Government of the District of Columbia - Department of Health Medical Assistance Administration Provider Application and MASH's Washington Metropolitan Area Transit Commission (WMATC) annual reports, from 2001 to 2006 MASH has owned between two (2) to six (6) vans registered to transport Medicaid recipients. During that time MASH has submitted approximately 42,331 claims to DC Medicaid for services they have provided to over 2,600 Medicaid recipients and were paid approximately $1,831,042 by DC Medicaid.  Every service billed to DC Medicaid by MASH was for a patient confined to a wheelchair.

In 2001 DC Medicaid paid MASH a total of approximately $440,271, in 2002 DC Medicaid paid MASH a total of approximately $468,674, in 2003 DC Medicaid paid MASH a total of approximately $410,784, in 2004 DC Medicaid paid MASH at total of approximately $292,760 and in 2005 DC Medicaid paid MASH a total of approximately $210,673.  An analysis of other DC Medicaid non-emergency transportation providers shows that the average provider was paid a total of $52,000 in 2002 and a total of

$60,000 in 2003.

**PROBABLE CAUSE**
**Medicaid Recipient R.S.**

On April 6, 2004, your Affiant interviewed Mardicai Carr regarding Medicaid recipient R.S. Carr was the Mental Retardation Developmental Disability Administration (MRDDA) case manager for R.S. Carr advised that R.S. attended day treatment at the Arts and Drama Institute for approximately the previous two (2) years. Carr advised that R.S. was never confined to a wheelchair. Carr stated that R.S. died on February 12, 2004.

On April 6, 2004, your Affiant interviewed Amy Brooks regarding Medicaid recipient R.S. Brooks is employed by RCM of Washington which was the residential provider for R.S. Brooks indicated that R.S. attended day treatment at PSI Family Services (PSI) for some time, but then transferred to the Arts and Drama Institute. Brooks stated that R.S. was never confined to a wheelchair. Brooks indicated that MASH only drove R.S. to his/her day treatment facility. Brooks provided that if R.S. was not present at his/her day treatment facility then he/she stayed home and did not receive services from MASH.

Your Affiant reviewed Medicaid claims data, which were provided by the Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigations and Compliance, as well as reviewed Participation Observation/Sign-In Sheets from PSI, and Day Program Daily Census logs from RCM.

Based on this review, your Affiant has determined that between the dates of

9

March 27, 2000 to February 11, 2004 MASH billed and was paid for 896 services for code A0130-Z5 or T2004-U6-U2 (Wheelchair van, round trip inside capital beltway with extra assistance). The actual services provided were consistent with codes A0123 or A0434-U2 (Ambulatory van, round trip inside capital beltway with extra assistance). The up-coded services caused a loss to the Medicaid program of $6,813. In addition, MASH billed for 60 services, which they did not render to R.S., causing an additional loss to the Medicaid program of $2,310. Therefore, the total Medicaid loss for Medicaid recipient R.S. is $9,123.

**Medicaid Recipient D.P.**

On June 28, 2004, your Affiant interviewed Antonio Linsey, an employee of PSI and the case manager for Medicaid recipient D.P. Linsey has been D.P.'s case manager for approximately one (1) year. During that time, D.P. has never been confined to a wheelchair. Linsey reviewed D.P.'s patient file and could find no documentation indicating that D.P. was ever confined to a wheelchair.

On August 11, 2004, your Affiant interviewed Cynthia Flutch regarding D.P. Flutch is a Licensed Practical Nurse (LPN) and a residential manager at RCM. D.P. has been a resident at RCM for many years, but Flutch has only known D.P. since November 1, 2002. D.P. is not currently confined to a wheelchair and according to records at RCM, D.P. never has been confined to a wheelchair. D.P. is transported by MASH Monday through Friday from RCM to his/her day treatment program at Brooklyn Senior Center. MASH only transports D.P. to Brooklyn Senior Center. On days that D.P. was absent from Brooklyn Senior Center, MASH did not transport him/her. Flutch kept a "Day Program Daily Census" which registered all days that D.P. was absent from Brooklyn

Senior Center.

Your affiant reviewed Medicaid claims data provided by the Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigations and Compliance, as well as reviewed Client Observation/Sign-In Sheets from PSI and Day Program Daily Census logs from RCM.

Based on this review, your affiant has determined that between the dates of June 13, 2000 to April 15, 2004 MASH billed and was paid for 847 services for code A0130-Z5 or T2004-U6-U2 (Wheelchair van, round trip inside capital beltway with extra assistance). The actual services provided were consistent with codes A0123 or A0434-U2 (Ambulatory van, round trip inside capital beltway with extra assistance). The up-coded services caused a loss to the Medicaid program of $6,486. In addition, MASH billed for 80 services, which they did not render to D.P. causing an additional loss to the Medicaid program of $3,033.75. Therefore, the total Medicaid loss for Medicaid recipient D.P. is $9,519.75.

**Medicaid Recipient E.J.**

On April 5, 2004, your affiant interviewed Diane Jones, the custodial parent of Medicaid recipient E.J. Jones advised that during the period of time that E.J. received services from MASH he/she was attending St. Johns Day Program for speech and language therapy. Jones advised that E.J. has never been confined to a wheelchair. Jones indicated that MASH drove E.J. from their residence at 2629 South Dakota Avenue, N.E. Washington, DC to St. Johns Day Program. Both St. John's Day Program and 2629 South Dakota Avenue are inside the capital beltway.

11

Your affiant reviewed Medicaid claims data provided by the Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigations and Compliance.

Based on this review, your affiant has determined that between the dates of May 11, 2000 to January 31, 2002 MASH billed and was paid for 370 services for code A0130-Z6 (Wheelchair van, round trip outside capital beltway with extra assistance). In fact the actual services provided were consistent with code A0123 (Ambulatory van, round trip inside capital beltway with extra assistance). The up-coded services for Medicaid recipient EJ caused a total loss to the Medicaid program of $18,237.50.

**Medicaid Recipient L.K.**

On October 7, 2004, your Affiant interviewed Medicaid recipient L.K., who advised that he/she attends PSI. L.K. is not currently in a wheelchair and has never been confined to a wheelchair. L.K. recalled being absent from PSI from March 9, 2001 to July 12, 2001 because L.K. was living in Maryland assisting a family member. During this time period MASH did not transport L.K. to PSI, although L.K. advised that occasionally MASH would pick him/her up in Maryland and transport him/her to his home in the District of Columbia.

Your affiant reviewed Medicaid claims data provided by the Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigation and Compliance and also reviewed Participation Observation/Sign-In Sheets from PSI.

Based on this review, your affiant has determined that between the dates of January 3, 2000 to April 15, 2004 MASH billed and was paid for 889 services for codes

A0130-Z5 or T2004-U6-U2 (Wheelchair van, round trip inside capital beltway with extra assistance). The actual services provided were consistent with codes A0123 or A0434-U2 (Ambulatory van, round trip inside capital beltway with extra assistance). The up-coded services caused a loss to the Medicaid program of $6,803.25. Additionally, MASH billed for 164 services, which they did not render to L.K. causing an additional loss to the Medicaid program of $6,172.50. Therefore, the total Medicaid loss for Medicaid recipient L.K. was $12,975.75.

**Medicaid Recipient R.M.**

On October 6, 2004, your Affiant interviewed Medicaid recipient R.M. R.M. advised that he/she is able to walk but may need a cane to assist with his/her walking. R.M. is not currently confined to a wheelchair and has never been confined to a wheelchair.

Your Affiant reviewed Medicaid claims data provided by the Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigation and Compliance.

Based on this review, your Affiant has determined that between the dates of March 16, 2000 to April 15, 2004 MASH billed and was paid for 991 services for code A0130-Z5 or T2004-U6-U2 (Wheelchair van, round trip inside capital beltway with extra assistance). The actual services provided were consistent with codes A0123 or A0434-U2 (Ambulatory van, round trip inside capital beltway with extra assistance). The up-coded services caused a loss to the Medicaid program of $7,572.75.

**Medicaid Recipient R.B.**

On April 15, 2004, your Affiant and other Special Agents from DHHS-OIG conducted surveillance at 1920 R Street, SE, Washington, DC 20020, which is the group home residence of Medicaid recipient R.B. At approximately 9:09AM, your affiant and DHHS-OIG Special Agent Elton Malone observed a white passenger van pull in front of the residence. A black male exited the vehicle and entered the residence. Approximately two (2) minutes later the same black male, accompanied by another black male, exited the residence and entered the white passenger van. The second black male was later identified as Medicaid recipient R.B. R.B. was walking with no assistance.

On April 15, 2004 at approximately 9:20AM, your Affiant called the group home at (202) 678-0578, which is where R.B resides. Your Affiant spoke with Bernice who is the assistant to Gilda Brown for the group home. Bernice advised that R.B. is no longer transported by MASH. The last date of service that MASH provided to R.B. was on Friday, April 9, 2004. On the date of the interview, Bernice observed R.B. leaving the residence into a non-MASH vehicle. R.B. has resided at this group home since December of 1998. Since that time, Bernice advised that R.B. has never been confined to a wheelchair. On the days that R.B. did not attend his/her day program he/she was not transported by MASH. Bernice advised that if R.B. had doctor's appointments on the days that he/she did not attend the day program, R.B.'s case manager George Neal transported him.

On April 20, 2004, your affiant interviewed George Neal, an employee of DC Department of Mental Health. Neal advised that he has been R.B.'s case manager for two (2) to three (3) years. During that time, R.B. has never been confined to a wheelchair. Neal advised that if R.B. did not go to PSI, then he/she stayed at the

independent living facility and was not transported by MASH. Neal provided that he transports R.B. to all of his doctor visits and psychiatry appointments.

Your affiant reviewed Medicaid claims data provided by the Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigation and Compliance and also reviewed Participation Observation/Sign-In Sheets from PSI.

Based on this review, your affiant has determined that between the dates of January 3, 2000 to April 9, 2004 MASH billed and was paid for 915 services for code A0130-Z5 or T2004-U6-U2 (Wheelchair van, round trip inside capital beltway with extra assistance). The actual services provided were consistent with codes A0123 or A0434-U2 (Ambulatory van, round trip inside capital beltway with extra assistance). The up-coded services caused a loss to the Medicaid program of $6,984. In addition, MASH billed for 122 services, which they did not render to R.B. causing an additional loss to the Medicaid program of $4,646.25. The total Medicaid loss for Medicaid recipient R.B. is $11,630.25.

**Medicaid Recipient L.A.**

On June 16, 2004, your affiant interviewed Lionel Moreland about Medicaid recipient L.A. Moreland is an employee of the Art and Drama Therapy Institute, a day treatment facility that L.A. used to attend. Moreland advised that L.A. was not confined to a wheelchair the entire time he/she attended the Art and Drama Therapy Institute.

On June 28, 2004, your affiant interviewed L.A.'s mother Ruby Wills. Wills advised that L.A. is mentally handicapped and is not able to hold a conversation. Wills

continued that L.A. was never confined to a wheelchair during the period of time that MASH provided transportation services to the Art and Drama Therapy Institute for him/her. Wills was not aware of any time that MASH drove L.A. anywhere other than the Art and Drama Therapy Institute.

Your affiant reviewed Medicaid claims data provided by the Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigation and Compliance.

Based on this review, your affiant has determined that between the dates of June 19, 2000 to April 15, 2004 MASH billed and was paid for 858 services for code A0130-Z5 or T2004-U6-U2 (Wheelchair van, round trip inside capital beltway with extra assistance). The actual services provided were consistent with codes A0123 or A0434-U2 (Ambulatory van, round trip inside capital beltway with extra assistance). The up-coded services caused a loss to the Medicaid program of $6,567. In addition, MASH billed for 57 services, which they did not render to L.A. causing an additional loss to the Medicaid program of $2,137.50. The total Medicaid loss for Medicaid recipient L.A. is $8,704.50.

**Medicaid Recipient J.C.**

On September 2, 2005, FBI Special Agent Leah T Nemetz received documents from Caroline Juarbe of the Medical Records Department at Suburban Hospital that verified that Medicaid recipient J.C. was a patient at Suburban Hospital from August 4, 2001 through August 17, 2001, which was his/her date of death.

Your affiant reviewed Medicaid claims data provided by the Government of the

16

District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigation and Compliance.

Based on this review, your affiant has determined that between the dates of August 6, 2001 to August 17, 2001 MASH billed and was paid for 6 services for patient J.C. while he/she was an inpatient at Suburban Hospital including one service on the date of death causing a total loss to the Medicaid program of $570.

**DECEASED RECIPIENTS**

Your Affiant reviewed Medicaid claims data provided by the Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigation and Compliance and Government of the District of Columbia Department of Health Certificates of Death.   Based on this review your Affiant determined that MASH billed DC Medicaid for transportation services provided to recipients that were deceased.

According to a District of Columbia Department of Health Certificates of Death Medicaid recipient M.D. died on January 6, 2000 in the District of Columbia.  Medicaid claims reveal that MASH billed DC Medicaid for thirty eight (38) services for recipient M.D. spanning approximately three (3) months after his/her date of death causing a loss to DC Medicaid of $1,425.

According to a District of Columbia Department of Health Certificates of Death Medicaid recipient R.B. died on June 12, 2001 in the District of Columbia.  Medicaid claims reveal that MASH billed DC Medicaid for five (5) services for recipient R.B. after his/her date of death causing a loss to DC Medicaid of $187.50.

According to a District of Columbia Department of Health Certificates of Death

Medicaid recipient J.H. died on January 26, 2000 in the District of Columbia. Medicaid claims reveal that MASH billed DC Medicaid for two (2) services for recipient J.H. after his/her date of death causing a loss to DC Medicaid of $75.

**FALSE STATEMENTS RELATED TO HEALTH CARE MATTERS**

On May 2, 2006, your Affiant received ACS Request for Transportation Prior Authorization Forms for MASH from Government of the District of Columbia, Department of Health, Medical Assistance Administration, Office of Investigations and Compliance. DC Medicaid requires non-emergency transportation providers to have prior authorization numbers for recipients prior to transporting them. These prior authorization numbers are valid for ninety (90) days, and then the provider must request new prior authorization numbers through ACS. ACS Request for Transportation Prior Authorization Forms were faxed by MASH to ACS. Your Affiant reviewed a selection of these faxed requests. The MASH requests indicated that every Medicaid client was confined to a wheelchair, although the investigation revealed that several of the patients were ambulatory in violation of Title 18 United States Code Section 1035 (a)(2): false statements related to health care matters.

In addition, each time MASH submits a false or fraudulent claim either electronically or paper to the Medical Assistance Administration for reimbursement is a violation of Title 18 United States Code Section 1035 (a)(2): false statements related to health care matters.

**TRANSPORTATION VEHICLES**

Your affiant has reviewed the WMATC Annual Report of MASH. MASH self-reported to the WMATC that as of January 20, 2006 the following is a list of their

revenue vehicles:

1997, GMC, MD Tag# 33298B, VIN# 1GTHG39F6V1096211

1997, GMC, MD Tag# 33009B, VIN# 1GTHG39F5V1095812

Acting General Manager Ahamed Nazar signed the referenced Annual Report on January 20, 2006.  A search through the Motor Vehicle Administration reveals that the above listed vehicles are registered to MASH at 801 Malibu Drive Silver Spring, MD 20901.

On August 16, 2006, August 10, 2006 and June 6, 2006, FBI S/A Leah Nemetz conducted surveillance at 801 Malibu Drive Silver Spring, MD 20901.  On this date S/A Nemetz observed:

1995 White Dodge van, VIN# 2B7KB31Z0SK512358, MD license plate# 616M965

parked in the vicinity of 801 Malibu drive Silver Spring, MD 20901.  S/A Nemetz advised that the above vehicle is a handicap accessible transportation style van.  A search through the Motor vehicle Administration reveals that the vehicle is registered to Ahamed Ibrahim Nazar at 801 Malibu drive Silver Spring, MD 20901.

Your affiant knows through his training, knowledge and experience that the revenue vehicles are used to transport Medicaid beneficiaries and can be considered an extension of the business MASH.  In addition, the above listed vehicles typically contain vehicle run sheets.  Vehicle run sheets are forms filled out by the driver of the vehicle that contain information such as: name of Medicaid beneficiary, date, time, destination, driver, service provided, etc.  Typically this information is forwarded to the billing department so that the correct code is billed to the Medicaid program.

Your affiant submits that based on his training, knowledge and experience that

the vehicles listed above contain vehicle run sheets and other pertinent records related to the billing of Medicaid transportation services.

## **CONCLUSION**

Based on the foregoing information and upon your affiant's training, knowledge and experience in the investigation of health care fraud, your affiant believes that fruits, instrumentalities and evidence, as described in attachment B, of violation of Title 18 United States Code Section 1347 (1):  to defraud any health benefit program and Title 18 United States Code Section 1035 (a)(2): false statements related to health care matters are kept

and concealed within the below listed transportation vehicles and therefore, a

search                    warrant                    is                    requested                    for:

- 1995 White Dodge van, VIN# 2B7KB31Z0SK512358, MD license plate# 616M965

- 1997 White GMC van, VIN# 1GTHG39F5V1095812, MD license plate# 33009B

- 1997 White GMC van, VIN# 1GTHG39F6V1096211, MD license plate# 33298B

_____
Troy Yeager Special Agent,
United States Department of Health and
Human Services – Office of Inspector
General

Seen and sworn to me this
___ day of September, 2006.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## ITEMS TO BE SEIZED

Based on the facts as are recited in the attached affidavit, your affiant has probable cause to believe the following records, documents, and materials are located at the above premises, and that these items may contain fruits, evidence and instrumentalities of the crimes described in the affidavit.

The terms "records," "documents," and "materials" include all of the subsequent items of evidence in whatever form and by whatever means such records, documents or materials, their drafts, or their modifications may have been created and stored, including, but not limited to, any handmade form (such as writing or drawing with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing or typing); and any electrical, electronic or magnetic form (such as tape recordings, cassettes, compact discs or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives or electronic notebook, as well as printouts or readouts from any magnetic storage device).

Items subject to search and seizure are as follows:

1)      Any and all lists, files, notes, claim forms, bills, receipts, billing records, purchase records, correspondence, contracts/agreements, appointment books/calendars, business cards, notes, ledgers, employee/employer documents, manual or electronic telephone directories and their contents, complaint letters/forms/notes, signature stamps, notes, markings, papers, folders, photographs, paper scraps, and partial documents relating to the individuals and businesses listed in the affidavit herein

2)      Any and all bank statements and records, checks, money drafts, money orders, letters of credit, cashiers' checks, safe deposit keys, statements of accounts, return and/or canceled checks, checkbooks and stubs, duplicate and copies of checks, deposit items, savings passbooks, loan documents and similar bank and financial accounts or other financial records relating to the individuals and businesses in the affidavit herein.